David G. BENSON, Gene O. Fozard, Felix Yerace, Eugene F. Ruperto, William G. Imblum, Kenneth N. Patton, Robert T. Nestler, William M. Brant, Joseph E. Stumpf, Ronald L. Weidman, George E. Brugos, Samuel J. Calderaro, James F. Dissen, Russell J. Drumheller, Michael P. Kearney, Joseph A. Mastraieni, Jr., Christy Lucci, Jr., Martin J. Olaharski and Harry W. Bost, Plaintiffs,

v.

James DOW and James J. Hanten, Defendants.

Robert T. NOVITSKY, Plaintiff,

v.

James DOW, Acting Administrator, Federal Aviation Administration; James J. Hanten, Tower Chief, Pittsburgh, Pa., Defendants.

Civ. A. Nos. 75–1159, 75–1160.

United States District Court, W. D. Pennsylvania.

Aug. 20, 1981.

Thomas Michalek, Pittsburgh, Pa., for plaintiffs.

Joel Strauss, Asst. U. S. Atty., Pittsburgh, Pa., for defendants.

## OPINION

ROSENBERG, District Judge.

These two related actions were filed in 1975 by twenty plaintiffs; one was filed by one plaintiff and the other by nineteen plaintiffs, both five years after causation. The actions deal with the same subject matter; and for all purposes they should be consolidated and will be consolidated here. The plaintiffs allege that their cause of actions occurred between March 24 and April 14, 1970, during which time they variously claimed sick leave, but which was variously denied them and suspensions imposed instead because of a concerted national "sick-out" in which they participated during that period of time.

These actions, after initiation, proceeded regularly with the usual pretrial skirmishing between counsel until a break-down in counsel representation for the plaintiffs occurred in the latter part of 1979 and throughout 1980. Upon motion of the defendant to dismiss for lack of prosecution, I insisted upon proper notice, either to appearance counsel, or to the individual defendants, personally. No counsel of record for the plaintiffs appeared with due authorization. Upon constant pressure and urging the defendants' counsel to procure addresses so that the plaintiffs could be served with notice, he finally produced the addresses and served them individually. Before that he insisted that there was no record of their whereabouts. After notice for a hearing, plaintiff, David G. Benson, appeared for all the defendants in court. He was informed by the court that he could represent himself only, and to inform the other 19 to appear for themselves or acquire counsel to represent them. Present counsel then entered an appearance and finally this court received briefs from both sides on March 16 and July 17, 1981. I hesitated to dismiss the action without due process and notice. Now the parties are properly before me for legal disposition of the actions.

In any event the failure of counsel appearance and known addresses for the plaintiffs' individual service of notice, with what seemed to be unconcern and apparent indifference for results, with need of constant importuning by the court of defense counsel for action and with the hesitancy of the court to take drastic action, the court was unduly delayed and disposition of these actions obstructed.

The two actions are based on appeals. Nineteen plaintiffs appealed the adverse decisions of the Federal Aviation Administration and the other appealed from the determination of the Civil Service Commission. All were based upon the fact that the plaintiffs, Air Traffic Controllers, who were employed by the Federal Aviation Administration (FAA) at The Greater Pittsburgh Airport challenged the suspensions by the FAA of up to 16 days for what was characterized as unauthorized leave of absence by each of the plaintiffs and failure to follow lawful orders from authorized officials.

The government agency alleged that the plaintiffs were participants in a nationwide "sick-out" which had been called by the Professional Air Traffic Controllers Organization (PATCO), when approximately one-quarter of them reported sick nationwide between March 24, and April 14, 1970.

On March 25th, thirty-five Pittsburgh controllers failed to report for their scheduled tours of duty at the Pittsburgh Air Traffic Tower, some it would appear without prior communication as required by the rule of employment.[1] The Chief of the Tower notified them on March 26, 1970, by letter to return to work, or in the alternative of the possible disciplinary action if they did not report for duty immediately and that they would be considered AWOL due to their absence from duty. On March 27th, they were all informed by a telegram of the issuance of a temporary restraining order by the United States District Court for the District of Columbia.

On March 29th, the Chief of the Tower sent letters to the plaintiffs proposing to remove them from employment with the FAA. After that the plaintiffs submitted

---

1. The reports of the Appeals Examiners did not uniformly discuss this issue.

medical certificates to the Pittsburgh facility of the FAA, but did not return to work until approximately two weeks later. Nineteen of the plaintiffs received letters of suspension dated April 17th. Following the notices of suspension, each of the plaintiffs was notified of his right of appeal by either of two administrative methods; first, by way of the Civil Service Commission and second, by way of an intra-agency appeal.

Of all the plaintiffs, Robert Novitsky, the plaintiff in Civil Action No. 75–1160 was the only plaintiff to seek an appeal before the Civil Service Commission. That review was limited to the procedural regularity of the administrative action as provided in 5 C.F.R. § 752.304 as authorized by 5 U.S.C. § 7701.[2] On October 7th, the Commission sustained the Agency determination, which was afterwards upheld by the Board of Appeals and Review of the Civil Service Commission. Approximately five years later, on March 17, 1975, Novitsky requested repayment, with interest, of the benefits and wages lost during his suspension, but his request was denied, as was his request for a rehearing. He then filed this action claiming the suspension procedures used by the FAA were unconstitutional.

The other nineteen traffic controllers, the first of whom was the plaintiff, Benson, at Civil Action No. 75–1159, sought intra-agency appeals of the suspension letters which superseded the letters proposing to remove the plaintiffs from employment. An examiner was appointed and he conducted a fact-finding inquiry without a formal hearing. Each claimant, however, was afforded an opportunity to make a personal presentation of any argument he felt necessary. They were all permitted to suggest any witnesses whom they wished the examiner to interview. Also, on some occasions the appeals examiner affirmatively solicited additional medical evidence from the plaintiffs' physicians. This intra-agency appeals procedure was in conformity with § 3 of the Federal Aviation Administration Order 3770.2A, Adverse Actions, Appeals and Grievances.[3]

Two years after the FAA decisions on the suspensions, the plaintiffs requested repayment of wages and benefits which they alleged they had lost. On April 11, 1975 the requests were denied by counsel for the FAA and requests for hearings by the plaintiffs were also denied on July 17th. The plaintiffs then filed these actions in this court. The government agency moved for judgment on the pleadings in each of the actions based on lack of subject matter jurisdiction and the government agency's motions were granted on February 21, 1976. Subsequently, after a petition to amend, leave was granted in both actions. Thereupon, the government filed its answers to the amended complaints. Pretrial statements were filed by both the plaintiffs and the defendants, but the plaintiffs failed, as previously stated, commencing at the end of 1979 and during 1980, to diligently pursue their actions.

2. "A preference eligible employee as defined in section 7511 of this title is entitled to appeal to the Civil Service Commission from an adverse decision under section 7512 of this title of an administrative authority so acting. The employee shall submit the appeal in writing within a reasonable time after receipt of notice of the adverse decision, and is entitled to appear personally or through a representative under regulations prescribed by the Commission. The Commission, after investigation and consideration of the evidence submitted, shall submit its findings and recommendations to the administrative authority and shall send copies of the findings and recommendations to the appellant or his representative. The administrative authority shall take the corrective action that the Commission finally recommends." The rules as based upon laws were seemingly in effect in 1972 and applicable to the circumstances of this case.

3. Chapter 3 Appeals provides for an election of either appeal through the Civil Service Commission or through the Agency (323). In an appeal to the Agency from suspension of 30 days or less, under 322b, the employee must submit his appeal to the deciding officer no later than 15 days of the effective date of the suspension and indicate whether he wants a grievance inquiry and if he wants to make a personal presentation. Otherwise, the appeal is decided upon the facts presented. The appeal is then processed under Step 2 of the agency grievance procedure under § 408 and the appeal official will consider the correctness of procedures and whether suspension was justified (322c).

Original counsel for the plaintiffs in this case was from the office of McVerry, Baxter, Cindrich, Loughren & Mansmann. A motion to withdraw appearance for counsel was made because one of their members became the United States Attorney. The motion for withdrawal was granted because the plaintiffs had advised the court that substitute counsel had been secured. However, Larry Zurawsky, Esq., never entered his appearance and informed the court by letter that he could not represent these plaintiffs. The court then advised Assistant United States Attorney Joel Strauss to obtain the addresses of all the plaintiffs in order that notices might be given to them so that we could proceed with the motions for summary judgment which had been filed by both the plaintiffs and the defendants. Attorney Thomas Michalek entered his appearance for the plaintiffs on March 11, 1981. The determination is now being made upon the entire record as a whole as authorized by law.

It is incumbent upon me to examine the record and the facts of the case as they were found by the examiner. From this examination of the examiner's report and the record itself, primarily of each individual doctor's certificate as it blends in with the findings of fact by the examiner, I find that approximately 2800 or about one-fourth of the total employment of air traffic controllers in the United States failed to report for work in their respective stations of employment on March 24, 1970.

In Pittsburgh, on March 24th, on the morning tour, eight out of thirteen failed to report; on the night tour thirteen out of fourteen failed to report. The trend continued in similar fashion through April 12th, when all returned to their employment. Just as extraordinarily as 20 air traffic controllers simultaneously became ill to the point of not being able to report to work on March 24th, and as extraordinary as was the similarity of the length of such inability to report to work, more extraordinary was the synchoneity by which all were able to report back to work the week of April 12th.

As for the reasons which each of these gave to the FAA for their failure to report for work in almost sum total they related to upper respiratory ailments with accompanying complaints. As an instance, checking one at random, it read "Ill. Under my care" or "Under my care for mass(?) infection on above date".

It is not ordinarily difficult for any person to observe objectively when one has a respiratory infection or common cold and the like, but in many cases they are not objectively observable because of only the subjective complaint of one so infected without objective showing. But when a large group of 35 or nearly 35 are infected by upper respiratory ailments and the like, it is most improbable that some would not show objective signs. Neither is it so probable that all would be so debilitated as to be unable to report for work, since it is common knowledge that some persons have greater resistance than others. But factually the examiner found that there was no epidemic causation for the total claim to such illness as would deprive them of capability to work.

From all the evidence presented by the doctors in these cases, there is little persuasive evidence for objective findings, and it would seem that all the plaintiffs could have very easily been merely what was related as a patient to a doctor—and nothing more. These the examiner questioned, and after questioning, very liberally, allowed the claimants to produce more credible evidence. No one produced a doctor and no one produced any substantial or clearly understandable evidence from a doctor, which would have reasonably sustained him fully. Yet in all of these it appears the examiner carefully scrutinized them and liberally allowed for any question of doubt which may have occurred for the possibility that there might have been a real complaint.

Without detailing each of the claimants, the record shows that the examiner reduced the suspension of 8 claimants after they presented some evidence, even if on a prescription blank, of upper respiratory infec-

tion, bronchitis, heart burn, tooth extraction, sacro-iliac sprain and one case of stress. The balance of the suspensions stood because of his explanation in each case of inconsistent insufficient or immaterial or unrelated statements from the doctors. Furthermore, the evidence is that the examiner earnestly sought the most possible evidence he could get to support each of the claimants but in some instances the doctors disregarded his earnestness for more evidence.

■ Thus it would seem that the examiner performed his functions earnestly and in accordance with law and applied his discretion in accordance with law. Under these circumstances it is not for this court to make determinations of fact, nor to override the judgment of the examiner charged with the function of making decisions. *Calhoun v. Bailar*, 626 F.2d 145, C.A.9, 1980; *Penna v. U. S. Army Corps of Engineers*, 490 F.Supp. 442, 443–444 (D.C.N.Y., 1980).

It may very well be that in the case of the claimant, Bost, I judicially might have allowed him sick leave when and during the so-called "sick-out" time for the correction of his nasal passages. But in so doing, it was just as incumbent upon him to comply with the rules of notice to his employer at that time as it would have been if he had been in a normal employment situation. That rule reads as follows:

> "Prior approval must be obtained from the supervisor for any absence for the purpose of medical, dental or optical examination or for any prearranged treatment in order for the absence to be charged to sick leave." Handbook 3600.4, parag. 37, b, (2).

It may be of a technical matter to deprive him of sick leave benefits but the primary obligation lies with the agency and not with the court.

With full liberality, the examiner gave allowance for each sick leave claim. This is understandable because it could very well be that one or more of them may not have been malingering and that someone may truly have been suffering from a "cold" condition. It is observable that in each case, the examiner did consider and give weight to subjective evidence where practically no objective evidence appeared, contrary to the holding in *Miller v. Bond*, 641 F.2d 997, C.A.D.C., 1981, where it was held that the agency gave weight only to objective evidence and not subjective evidence. Thus, the *Miller* case has no application here.

So far as any notice was concerned to the plaintiffs, the record discloses that they were first dismissed, afterwards suspended, but notice was given to them. They were given the right to make a personal presentation of any arguments they felt significant; they were permitted to suggest witnesses whom they wished the examiner to interview; and the appeals examiner could solicit additional medical evidence from the plaintiffs' physicians. The plaintiffs also challenged the notice given to them by their employer as being in violation of the requirements set forth in *Miller, supra*. There the notice to the employees was simply one informing them of their absence stating "Your absence of fourteen scheduled work days during this period was not approved by proper authority." (page 1001). The *Miller* court also said, ". . . appellees were deprived of any opportunity to defend against the crux of the suspension charges." (page 1003).

■ In the instant case, the plaintiffs all received a long form letter with fill-ins in which it was stated the letter was a notice to suspend the plaintiffs (1) for a period of a certain number of days; (2) that the plaintiff failed to report for a scheduled tour of duty on a certain shift on a certain day continuing to a particular date; (3) that the plaintiff had not provided an acceptable explanation for his absence; (4) that he could reply personally in writing to specific persons; (5) that he could submit affidavits in support of his reply; (6) that he would be allowed 15 calendar days from the date of the receipt of the letter to submit a reply; (7) that consideration would be given to extending the period for reply if he requested and stated his reasons for desiring more time; (8) that full consideration would be

given to any reply submitted; (9) if the plaintiff did not understand the reason for the proposed suspension, he could telephone a specific number for further explanation; and (10) that after a reply was received or after expiration of the 15-day limit, if he did not reply, a written decision would be issued to him. The notice was only the beginning of the concern which the defendants had for the employee because, when the matter was referred to hearing in the usual course of due process, the examiner provided the plaintiffs the previously outlined opportunities to present evidence. This procedure came in full compliance with the requirements of law and rules governing these cases. Thus, *Miller, supra,* does not support the plaintiffs in their contention of inadequate notice and insufficient evidence to support their suspensions.

In *Calhoun v. Bailar, supra,* 626 F.2d at 147, the court reiterated that its function in administrative discharge cases is limited to determining whether the applicable procedures have been complied with, and whether the dismissal was supported by substantial evidence, and was not arbitrary and capricious. Citing, *Alsbury v. U.S. Postal Service,* 530 F.2d 852, 854, C.A.9, 1976, cert. den. 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976). The court further stated that such cases are not tried de novo, but are limited to a determination based on the record.

In *Smith v. United States Air Force,* 566 F.2d 957, C.A.5, 1978, the court stated that "In cases involving the termination of federal employment, the scope of judicial review is limited to a determination of whether the administrative action has complied with the required procedural due process or whether the administrative action is arbitrary or capricious." *Thurman v. TVA,* 533 F.2d 180, 183, C.A.5, 1976; *Dozier v. United States,* 473 F.2d 866, 868, C.A.5, 1978.

In the case of *Dennis v. Blount,* 497 F.2d 1305, 1309, C.A.9, 1974, the court discussed the scope of review in the case of administrative action with regard to federal employees:

"The district court correctly confined itself to considering the administrative record. The standard of review if narrow.[4]"

"[4] This court has, to some extent, broadened its concept of the scope of review in such a case as this.

In *Seebach v. Cullen,* 9 Cir., 1968, 338 F.2d 633; *Brancadora v. FNMA,* 9 Cir., 1965, 344 F.2d 933; *Taylor v. United States Civil Service Commission,* 9 Cir. 1967, 374 F.2d 466; *Mancilla v. United States,* 9 Cir. 1967, 382 F.2d 269; and *Benson v. United States,* 9 Cir., 1970, 421 F.2d 515, we said that the only issue was whether the agencies had substantially complied with statutory and administrative procedures. In *Burke v. Carpenter,* 9 Cir. 1967, 387 F.2d 259 and *Toohey v. Nitze,* 9 Cir. 1970, 429 F.2d 1332, we also considered whether the action was an abuse of discretion and whether factual determinations were supported by substantial evidence. However, even under the broadest scope as set forth in *Toohey,* the scope of review is narrow. As we emphasized in *Toohey* at 1344, 'Dismissal from federal employment is largely a matter of executive agency discretion... The scope of judicial review is narrow.' "

See also, *Jaeger v. Stephens,* 346 F.Supp. 1217 (D.C.Colo., 1971).

In the instant case, the scope of this court's review has been confined to the above outlined limitations and I have found the adverse administrative actions in these cases to be in full compliance with the required procedures, supported by substantial evidence from the record as a whole, and not arbitrary, capricious or an abuse of discretion.

■ While this case should have been disposed of long before now, it would seem that laches played a considerable part in the failure to pursue the case. However, it is not necessary to decide the case on laches, even though a federal employee as a matter of law is not entitled to recover in a suit against the government where he took no steps to test his legality of the action until 3 years later. *Nicholas v. United States,* 257 U.S. 71, 42 S.Ct. 7, 66 L.Ed. 133 (1921). The same result occurred in *Norris v. United States,* 257 U.S. 77, 42 S.Ct. 9, 66 L.Ed. 136 (1921), where the delay was only 11 months, and in *Kessler v. GSA,* 236 F.Supp. 693, 697 (S.D.N.Y., 1964), affirmed 341 F.2d 275, C.A.2, 1964.

Under the circumstances of this case there are no questions of material fact before me and if none exists, the actions may properly be determined on a question of law. *Swettlen v. Wagoner Gas & Oil, Inc.,* 369 F.Supp. 893, 894 (W.D.Pa.1974); *Hubicki v. A.C.F. Industries,* 484 F.2d 519, C.A.3, 1973.

Since the plaintiffs have failed to present any basis for a determination in their favor or for any judgment in their favor and the action of agency, and particularly the hearing examiner is sufficient in law, the motion of the defendants for summary judgment will be granted.